UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

**Janice E. Burke,**

**Plaintiff,**

**V.**                                        **04-CV-1430**

**New Venture Gear Inc., Jesse H. Hall, Scott Stanton,
President of United Automobile, Aerospace and Agricultural
Implement Workers of America Local 624, and Stephen
Yokich, President of the International Union, United
Automobile, Aerospace and Agricultural Implement
Workers of America,**
                                 **Defendants.**


◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

APPEARANCES:
Janice E. Burke
Plaintiff *Pro Se*

Hancock and Estabrook LLP
John T. McCann, Esq., of Counsel
1500 MONY Tower I
Syracuse, New York 13221
Attorneys for Defendant New Venture Gear, Inc.

Blitman & King LLP
Kenneth L. Wagner, Esq., of Counsel
Franklin Center, Suite 300
443 North Franklin Street
Syracuse, New York 13204-1415
Attorneys for Defendants United Automobile, Aerospace and
Agricultural Implement Workers of America Local 624, and
International Union, United Automobile, Aerospace and Agricultural
Implement Workers of America.

**Hon. Norman A. Mordue, Chief District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**INTRODUCTION**

     This is an employment discrimination action brought *pro se* by Janice E. Burke, an

African-American woman who worked as a machine operator at defendant New Venture Gear,

Inc. ("NVG"), and its successor, Magna Powertrain of America, Inc. ("Magna"), from September 27, 1997, to May 13, 2005.[1]  Magna purchased the NVG facility on September 30, 2004; it is not, however, a party to this lawsuit.  Plaintiff claims that while employed at NVG, she was subjected to sexual harassment by her supervisor, Jesse Hall,[2] and that after she filed a harassment charge against him, the sexual harassment stopped but she was subjected to retaliatory disciplinary actions.  She further claims she was not afforded adequate representation by defendants Scott Stanton, President of United Automobile, Aerospace and Agricultural Implement Workers of America Local 624 ("Local 624"), and Stephen Yokich, President of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("International Union") (collectively, "union defendants").  The amended complaint (Dkt. No. 19) states it is based on 42 U.S.C. § 1981 ("section 1981"), 42 U.S.C. § 1983 ("section 1983"), 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and Labor Management Relations Act, 29 U.S.C. § 141, *et seq.*

There are presently three summary judgment motions pending.  NVG (Dkt. No. 61) and the union defendants (Dkt. No. 63) move for summary judgment dismissing the amended complaint.  Plaintiff cross-moves (Dkt. No. 65) for summary judgment.

Summary judgment is appropriate "where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*, 448 F.3d 573, 579 (2d Cir. 2006) (internal quotation marks omitted).  A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact

---

[1] The amended complaint refers to NVG and Magna as "Magna Drivetrain."

[2] The Court previously granted the motion by defendant Jesse Hall to dismiss plaintiff's claims against him (Dkt. No. 32).

-2-

exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962).

For the reasons set forth below, the Court denies NVG's motion with respect to plaintiff's Title VII sexual harassment and retaliation claims, and grants it with respect to her sections 1981 and 1983 claims.  The Court grants the union defendants' motion in its entirety.  Plaintiff's motion for summary judgment is denied.

**PLAINTIFF'S CLAIMS AGAINST NVG**

**Facts**

The following facts, supported by the record, are undisputed unless otherwise noted. Plaintiff began working at NVG as a machine operator on September 27, 1997.  At all pertinent times she was a member of Local 624.  Beginning in 2002, plaintiff worked the second shift in Department 290.  Jesse Hall, an African-American man, became plaintiff's supervisor in Department 290 in or about January 2003.  Hall's area manager was Barbara Stone.

On October 6, 2003, plaintiff submitted a grievance to Local 624 against Hall as her supervisor.  She complained that he would allow other coworkers to change out of their work clothes prior to the end-of-shift meeting, but would not permit her to do so; that he would tell her to change jobs during the workday at times that caused her to forfeit her breaks; that he persisted in assigning her jobs that aggravated a previous injury to her hand and wrist; and that he unfairly scheduled her to work weekends.

Hall disciplined plaintiff on October 23, 2003 for leaving a meeting early, resulting in a

five-day disciplinary layoff ("DLO").  At Stone's direction, Hall issued a Department Managers

Report against plaintiff for insubordination on November 13, 2003.

On November 17, 2003, plaintiff filed with the New York State Division of Human Rights

("SDHR") a charge of sexual harassment against Hall.[3]  This charge, dated November 14, 2003,

alleges as follows:

> During the summer of 2003, my department supervisor, Jesse Hall began
> assigning me to jobs with repetitive motion which was adversely affecting
> both of my hands which were hurt in prior job-related injuries. I eventually
> filed a grievance with my union and since that time, I have been exposed to
> acts of sexual harassment perpetrated by others in my department and Mr.
> Hall because of my grievance. Acts of sexual harassment have included
> placing of Play Girl Magazine at my work site and disparaging comments
> about my physical characteristics as I embarked on body-building in 2002.
>
> Mr. Hall has forbidden me to change into my street clothes prior to
> department meetings held at the end of second shift. In addition, Mr. Hall
> purposefully makes the meeting last longer which results in my having to
> change after the meeting and walk unescorted through the parking lot late
> at night. Other coworkers are still permitted to change their clothing prior
> to the start of the department meetings.
>
> Based on the foregoing, I can only conclude that my working conditions
> have deteriorated because I have complained about sexual harassment in
> my department. On November 13, 2003, I was suspended for five working
> days and one paid holiday by Mr. Hall and his supervisor, Barbara Stone
> because they alleged that I was told not to run a part which I did run. I was
> never given such an order and this was the latest manifestation of
> retaliatory treatment of me.

(Paragraph numbering omitted.)  Plaintiff testified at her deposition that Hall stopped sexually

harassing her after she filed the SDHR charge.

Plaintiff's subsequent disciplinary history is as follows.  Hall issued a 10-day DLO to

plaintiff on February 9, 2004, for reporting late to her work station.  He issued a 15-day DLO to

---

[3] SDHR dismissed plaintiff's charge upon a finding of no probable cause.

plaintiff on May 27, 2004, for failure to follow the reasonable instructions of a supervisor.  And on August 14, 2004, NVG's Labor Relations Representative Andrew Quinn issued a 30-day DLO to plaintiff for insubordination, failure to follow reasonable instructions, abusive language, and exiting the plant without safety equipment.  Plaintiff asserts these disciplinary actions were not justified but were taken as retaliation for her filing the SDHR charge.  Plaintiff's employment by NVG ended on September 30, 2004, when Magna purchased NVG's facility.

**Claims under Title VII**

<u>*Sexual harassment – applicable law*</u>

Under Title VII, it is unlawful for an employer to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1).  To show that she was subjected to sex discrimination by virtue of a hostile work environment, plaintiff must prove: (1) the existence of workplace harassment directed towards her because of her sex; (2) that the harassment was objectively severe or pervasive, *i.e.*, that it created an environment that a reasonable person would find hostile or abusive, and (3) that plaintiff subjectively perceived the work environment to be  hostile or abusive."  *See Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001).  Not all workplace harassment is prohibited; rather, the law prohibits only conduct involving statutorily proscribed forms of discrimination.  *See Gregory v. Daly*, 243 F.3d 687, 692 (2d Cir. 2001) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).  Thus, courts "consider the extent to which the conduct occurred because of plaintiff's [membership in a protected class]."  *Demoret v. Zegarelli,* 451 F.3d 140, 149-50 (2d Cir. 2006).

To analyze a hostile work environment claim, courts "look to the record as a whole and

-5-

assess the totality of the circumstances, considering a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 149 (quoting *Harris v. Forklift Systems*, 510 U.S. 17, 23 (1993)).  For discriminatory comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents or episodic conduct.  *See Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999).  Rather, plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.  *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).  Because a hostile work environment claim focuses on the nature of the workplace environment as a whole, evidence of discriminatory harassment and hostility beyond that which is directed specifically at plaintiff may be relevant to the analysis.  *See id.*

### *Sexual harassment – discussion*

NVG contends that it is entitled to summary judgment as a matter of law dismissing plaintiff's sexual harassment hostile work environment claim on two grounds.  The first is that Hall's conduct was directed towards her because she was a difficult employee, not because of her sex.  The second is that the alleged harassment was not objectively severe or pervasive, *i.e.*, that it did not create an environment that a reasonable person would find hostile or abusive.

NVG submits affidavits and reply affidavits from various officers and employees of NVG. The affidavit of Andrew J. Quinn, Human Resources Coordinator and Labor Relations Representative for NVG during the times in question, states that NVG maintains a "zero

tolerance" policy prohibiting discrimination or harassment in the workplace, and discipline at

NVG is administered equally to minority and non-minority employees based on the severity of

the situation and the individual facts of each case. Quinn states that plaintiff did not complain to

anyone in NVG's human resources department about sexual harassment by Hall or anyone else

prior to filing the SDHR charge on November 14, 2003. NVG also submits the affidavit of

Barbara Stone, an area manager at NVG at the pertinent times; her area included Department 290.

Stone's affidavit supports Hall's disciplinary actions against plaintiff. Both Quinn and Stone

indicate that plaintiff was a difficult employee, that she had been disciplined by other supervisors,

that she was regularly late for work, that she did not follow instructions, and that she otherwise

failed to comply with NVG's rules.

Plaintiff states that sometime in 2002, she voluntarily transferred into Department 290. In

around January 2003, Hall became her supervisor. Plaintiff alleges that when she was first

introduced to Hall, he requested a hug from her; she responded with a handshake. She states in

her Memorandum of Law (which bears her notarized signature) that her "initial difficulties" with

Hall began in 2003; that he made it a point to come to her job station and talk with her; that

gradually the conversations began to make her uncomfortable; and that comments about her

manner of dressing "became his daily introduction to generating conversation." She says: "I had

made it clear that I found his comments distasteful but he continued. It seemed the harsher I

became at telling him to leave me alone, the more aggressive he became in conversation and

'accidental contact' with my body."

In the same vein, plaintiff testified in her deposition that Hall would turn general

conversations to topics such as plaintiff's son's girlfriends and "intimate behaviors" of

relationships between men and women.  Regarding how many conversations she had with Hall that she considered sexually harassing, plaintiff referred to "several conversations" and testified:

> The thing about it is it was difficult to say because Mr. Hall and I had numerous conversations and ... he may make a comment and that was not sexual harassment, but I – but it was – his notorious way of leading to conversation that was inappropriate, and what I would do, if I had a sense that he was going in that direction, I would remove myself from the conversation.

Plaintiff also stated in her deposition that on one occasion Hall referred to her as "Miss Temptation" and on another occasion as "a piece of ass" when speaking to third parties in her presence.  She also testified that after she had "embarked on a body building career" in 2002 he made comments to her such as: "[Y]our butt looks really nice since you've been working out." Plaintiff also testified to one conversation in which Hall asked how she behaved "behind closed doors"; he speculated that she might be "wild" or a "freak" and referred to himself as a "lion-tamer."  Plaintiff further testified that once someone left a Playgirl magazine at her work station; she did not, however, know who had done it, and had no reason to believe Hall was responsible.

During an unspecified time period, she testified, her job entailed working "on a cement floor where when somebody walked up on the floor – I mean, walked up to your job, you wouldn't know it."  Hall would walk up to her when she was "blowing out" the machine.  She testified:

> I would be bent over cleaning out the machine and he would walk up to me ... at a totally unacceptable distance....  And, of course, when I had stood up, we continued [sic] bumped into one another.  And after it happened a second time, I just asked him, I said, you know what, I said you can stand over there, I said, and call my name and, I said, and I will hear you.  I said, it's no need for you to take and stand up on me like that and call my name, I said, because when I turn around it leaves me no room whatsoever to make a turn.

In what appears to be a description of one such incident, plaintiff testified as follows:

> A. On one occasion he – I was on one of my machines and I had a air gun blowing chips off of the ... part of the machine where I would set the part on, and he walked up a – to me, to my back and I was in a bending position blowing the machine up. He walked over to my back and very close to me and – and then said – yelled out my name and I stood up and when I stood up, I  basically was in contact with – with his body.
> Q. Okay.  But when you stood up, I take it you – your body hit his body, is that what you're saying?
> A. His body was that close to my body when I stood up, I was in contact with his body.
> Q. Okay.  I – I take it you did not know how close he was when you stood up, is that true?
> A. No. If I had known how close he was, I would have moved my body, moved around.  My preference in talking to anybody is at arm's length.
> Q. Okay. And then what happened?
> A. I bumped in – I bumped into him, I stood up, and I turned around and – and then I backed off and as opposed to saying what I – first thing that came to my mind, I took the air gun and I just was squeezing it to control ... my anger and refrain from saying what I wanted to say, and he looked at me, he said, thank you, that was good to me, too.
> Q. Referring to the air gun?
> A. I'm not sure what he was referring to, what part of that he was referring to.
> Q. Where was the air gun pointing when you hit the control?
> A. Straight up to the ceiling.  I believe it was that particular conversation that I told him that he was sick, to stay away from my job.

In her deposition, plaintiff also described an incident in which Hall called her in to his office.  She testified:

> [W]hen I went into his office, I – there was a – a – a radio playing.  I don't know if it was a radio or what it was.  All I heard was the music playing. And the music that was playing was a – a song by Marvin Gaye, title is Sexual Healings where it speaks of sexual intimacy.   And when I went in there, I sat down and he was talking and – and to – and I don't even remember what the conversation – I mean, what I was in the office for.  But he had a chair that you could push back like this (indicating) and he kept pushing back on the chair and – and his hands kept rubbing.  I mean, he'll go from here (indicating), from his knees, to the pulling back.   He rubbed on – was rubbing on his – go from his knees and then rub up to his hip area.  And this was – And I was sitting there.... [F]inally, you know, I told

> him, you know – I mean, his facial expression and little smirk on his face, and I told him, I said, you know, I said, screw this, I said, next time you want to have a meeting with me,  I said, I would prefer to have my steward available I said because this is – this is disgusting.  I said, you're disgusting. And that was the last time that I had a meeting alone with him.

Plaintiff testified that on one previous occasion when she had been in Hall's office, the same song had been playing, but she had "just thought it was a fluke that I was in the office and that particular song came on."

Plaintiff also alleges that during summer 2003, Hall purposefully gave her job assignments that he knew would aggravate a prior injury to her wrist, repeatedly attempted to arrange meetings alone with her, and gave her unwarranted discipline.  According to plaintiff, prior to working under Hall's supervision she had received only one DLO, from a previous supervisor, Rick Piccolo, on May 29, 2002.

A review of the record evidence, including the evidence briefly summarized above, would permit a reasonable factfinder to conclude that Hall directed harassing conduct against plaintiff because of her sex between January 2003, when he became her supervisor, and November 17, 2003, when she filed her SDHR charge,[4] and that the harassing conduct occurred within the 300 day period prior to plaintiff's filing of the SDHR charge.  In addition, on the record evidence, a reasonable factfinder could conclude Hall's conduct during this time period was sufficiently frequent, humiliating, continuous and concerted so as to alter the conditions of plaintiff's working environment.  NVG's submissions do not establish as a matter of law that it is entitled to dismissal based on the *Faragher/Ellerth* defense or on any other ground.  *See Burlington Inds., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807

---

[4] Plaintiff testified at her deposition that Hall stopped sexually harassing her after she filed the SDHR charge.

(1998).  Nor has plaintiff established as a matter of law that she is entitled to summary judgment. Accordingly, NVG's and plaintiff's motions insofar as they concern sexual harassment are denied.

### Retaliation – applicable law

To make out a *prima facie* case of retaliation, plaintiff must show that she was engaged in protected activity known to the employer, that she suffered an adverse employment action, and that there was a causal connection between the protected activity and the adverse employment action. *See Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir. 1998).  To satisfy the "protected activity" element, the plaintiff need have had a good faith, reasonable belief that she was opposing an employment practice made unlawful by Title VII.  *See Kessler v. Westchester Co. Dept. of Social Servs.*, 461 F.3d 199, 210 (2d Cir. 2006).

Once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment action. *See Quinn*, 159 F.3d at 768.  If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation.  *See id.* at 769.

### Retaliation – discussion

Plaintiff's November 17, 2003 filing of her SDHR charge alleging sexual harassment by Hall constitutes a protected activity.[5]  Plaintiff claims that, after she filed the SDHR charge, she was the subject of retaliatory disciplinary actions.  Hall issued a 10-day DLO on February 9,

---

[5]  Because the grievance plaintiff submitted to Local 624 against Hall on October 6, 2003, does not allege sexual harassment or any other prohibited employment practice, there is no basis to find that when she submitted that grievance, plaintiff had a good faith, reasonable belief that she was opposing an employment practice prohibited under Title VII.

2004, for reporting late to her work station and a 15-day DLO on May 27, 2004, for failure to

follow the reasonable instructions of a supervisor.  On August 14, 2004, Quinn issued a 30-day

DLO to plaintiff for insubordination, failure to follow reasonable instructions, abusive language,

and exiting the plant without safety equipment, based a report from Hall.  Plaintiff contends these

disciplinary actions were not justified.  Moreover, plaintiff alleges Hall began scheduling her to

work weekends and otherwise treated her unfairly in his role as supervisor.

      In support of its contention that the disciplinary actions were not retaliatory but rather

were justified by plaintiff's tardiness and insubordination, NVG relies on the affidavits of Quinn

and Stone indicating that plaintiff was a difficult employee, that she had been disciplined by other

supervisors, that she was regularly late for work, that she did not follow instructions, and that she

otherwise failed to comply with NVG's rules.  Quinn further states that he was directly involved

in the final disciplinary action issued to plaintiff by NVG, the 30-day DLO given on August 14,

2004.  This DLO resulted from plaintiff's leaving the plant at 11 p.m. despite Hall's directive that

she was not entitled to a paid lunch break and therefore had to work until 11:30 p.m.  Upon

reviewing the facts, Quinn concluded that Hall's directive was consistent with NVG's agreement

with the union regarding paid lunch breaks, and that Hall had good cause to discipline plaintiff for

insubordination, failure to follow instructions, and abusive language.

      On this record, NVG's evidence that the discipline meted out to plaintiff was appropriate

is sufficient to withstand plaintiff's motion for summary judgment with respect to retaliation.

Plaintiff's evidence that after she filed the SDHR charge, Hall's unfair treatment and unwarranted

discipline escalated is sufficient to withstand NVG's motion for summary judgment in this

regard.  Plaintiff's and NVG's motions for summary judgment on retaliation are denied.

### Claims against NVG under sections 1981 and 1983

Plaintiff's submissions do not support a claim that she was subjected to racial discrimination so as to support a claim under section 1981.  Nor is there any basis to find that NVG acted under color of state law as required to support a claim under section 1983.

## PLAINTIFF'S CLAIMS AGAINST THE UNION DEFENDANTS

**Background**

Plaintiff first asserted her claims against the union defendants when she filed her amended complaint (Dkt. No. 19) on June 9, 2005.  Local 624 represented her during her employment by NVG and then Magna (which purchased NVG on September 30, 2004), until Magna terminated her on May 13, 2005.

The undisputed affidavit of Doug Havens, president of Local 624, explains the grievance and arbitration procedure set forth in the collective bargaining agreement ("CBA") between Local 624 and NVG, and later Magna.  This procedure is the exclusive means of resolving an employee's claim that he or she has been subjected to a contract violation by management.  In step one, if the steward representing the complaining employee's department and shift believes there was or may have been a contractual violation, and if the steward is unable to resolve the matter, the steward submits a written grievance to management.  If the grievance is not resolved, the steward moves it to step two by referring it to the plant shop committee. At step two, the committeemen present the written grievance to the employer's labor relations director.  If the grievance is not resolved at step two, the committeemen may decide to move it to step three, at which point the Local 624 president, in consultation with other Local 624 officers, attempts to resolve the matter with the employer's personnel director.  If the dispute is unresolved at step

-13-

three, Local 624 may move the grievance to step four by referring it to the regional office of the International Union. Unless and until a matter reaches step four, the International Union has no direct decision-making authority with respect to the grievance.

Plaintiff claims that Local 624 did not adequately handle her grievances against NVG and Magna, and that it effectively "abandoned" her.  Plaintiff also alleges that the first time it informed her of the existence of its Civil Rights Committee ("CRC") was in connection with the discipline against her for the July 26, 2004 incident.  Plaintiff states that if she had known of and resorted to CRC earlier, and if Local 624 had properly handled her grievances, she would not have had so many disciplinary charges against her and would not have been terminated.

**Claims against International Union**

Plaintiff makes no allegations against the International Union, and all individuals of whose conduct she complains were representatives of Local 624.  All claims against the International Union are dismissed.

**Claims against Local 624 under Title VII**

Before bringing a Title VII action against a party, a plaintiff must file an administrative charge against that party with the Equal Employment Opportunity Commission or an authorized state agency.  *See* 42 U.S.C. § 2000e-5(f)(1).  The SDHR charge filed by plaintiff in the case at bar named only NVG, and she filed no administrative charge against the union defendants.  There is no evidence of an identity of interest between NVG and the defendants, nor is there any other basis to find that plaintiff's SDHR charge against NVG satisfied the administrative filing requirement with respect to the union defendants.  *See generally Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 619-20 (2d Cir. 1999).  Thus, any claim against the union defendants under Title VII is

dismissed.

**Claims against the union defendants under sections 1981 and 1983**

Plaintiff's submissions do not support a claim that she was subjected to racial discrimination so as to support a claim against the union defendants under section 1981.  Nor is there any basis to find that the union defendants were state actors as required to support a claim under section 1983.

**Claims against the union defendants for breach of the duty of fair representation**

Plaintiff makes no claim that the International Union was involved in handling her grievances or in otherwise representing her in any respect.  None of her grievances was referred by Local 624 to the International Union.  On this record, there is no basis for a claim that the International Union owed plaintiff a duty of fair representation and therefore no basis for a claim that it breached such a duty.  The discussion below pertains only to plaintiff's fair representation claims against Local 624.

To establish a claim against a union concerning its representation of a member's interests, the plaintiff must show both that the employer breached the labor agreement, 29 U.S.C. § 185, and that the union breached its duty of fair representation.  *Carrion v. Enterprise Ass'n, Metal Trades Branch Local Union 638*, 227 F.3d 29, 34 (2000).  The duty of fair representation requires a union to represent all members of its bargaining unit honestly and in good faith, without hostility, discrimination, or arbitrary conduct.  *See Vaca v. Sipes*, 386 U.S. 171, 177 (1967).  "A union does not breach its duty of fair representation when it makes a good faith decision that the merits of a particular claim do not warrant instituting legal proceedings, for a union must be allowed to exercise reasonable discretion as to how it can best satisfy the interests of the

-15-

individual as well as the interests of the collective unit." *Pyzynski v. New York Cent. R. Co.*, 421 F.2d 854, 864 (2d Cir. 1970) (citing *Vaca*, 386 U.S. at 194).  A union has considerable discretion in dealing with grievance matters, *see Ayala v. Union de Tronguistas de P.R., Local 901*, 74 F.3d 344, 345-46 (1st Cir.1996); thus, "the duty of fair representation is not breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance." *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1153-54 (2d Cir.1994).  A cause of action against a union for breach of its duty of fair representation is subject to a six-month limitations period.  *See DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 155 (1983); *Carrion*, 227 F.3d at 33-34.

Plaintiff first named Local 624 defendants in her amended complaint (Dkt. No. 19), filed on June 9, 2005.  Thus, claims accruing prior to December 9, 2004 are time-barred.  Several of the incidents upon which plaintiff bases her claim of inadequate representation occurred and were known to plaintiff prior to December 9, 2004.  The amended complaint avers that during summer 2003, Local 624 alternate steward Joe Marlowe contradicted her statements concerning a job-related injury to her hands; that on January 20, 2004, Local 624 steward Robert Kelly witnessed harassment by Hall; that on April 26, 2004, Local 624 officials provided "no advice ... to avoid the reoccurrence" of confrontations with Hall; that on May 6, 2004, Local 624 officials did not address an absenteeism issue; that on May 18, 2004, Marlowe inappropriately dealt with her alleged failure to color-code her parts; that on May 27, 2004, Marlowe was present for a meeting in which she was suspended for fifteen days; that on or about July 23, 2004 a Local 624 steward did not assist her; and that Local 624 failed to advise plaintiff until about August 4, 2004

that the Local 624 Civil Rights Committee could investigate her ongoing problems with Hall. According to undisputed evidence, all of these alleged incidents took place and were known to plaintiff more than six months before plaintiff filed the amended complaint. There is no basis in the record to toll or extend the limitations period or to find that these incidents are part of a continuous pattern of inadequate representation. Plaintiff's claims that Local 624 breached its duty of fair representation with respect to these incidents are time-barred.

There are five grievances that are not time-barred by the six-month statute of limitations. Those five grievances had not been finally resolved when plaintiff filed her amended complaint; rather, they remained pending at the third step of the grievance procedure until August 10, 2005, when the Local 624 executive committee determined to withdraw them. Doug Havens, president of Local 624, explains in his affidavit that the executive committee, of which he was a member, determined to withdraw the grievances rather than proceed to arbitration, because all members agreed the disciplinary actions were taken for proper cause and plaintiff's cases were not winnable at arbitration. Havens explains that the committee did not withdraw the grievances earlier because it wanted to investigate further the grievance stemming from an incident occurring on February 9, 2004; if that grievance had been successfully arbitrated, it would have affected the impact of the subsequent disciplinary actions under the contractual progressive discipline scheme. As set forth in more detail below, Local 624 thoroughly investigated the February 9, 2004 incident and found no basis to pursue the grievance to arbitration.

Phillip DeMatteo, a committeeman for Local 624, explains in his affidavit that during the times in question, disciplinary issues and grievances originating in plaintiff's shift and department were initially handled by stewards Kelly and Marlowe. If involvement by a higher-level union

-17-

official was needed, DeMatteo became involved.  According to DeMatteo, his involvement was required in many of plaintiff's disciplinary problems and grievances.  He describes in his affidavit several disciplinary and other matters handled for plaintiff by Local 624, many of which resulted in favorable outcomes for plaintiff.

DeMatteo's affidavit describes in detail Local 624's activities on plaintiff's behalf in connection with the five grievances that are not time-barred.  The first incident occurred on October 22, 2003, when plaintiff was issued a written Department Manager's Report ("DMR") for insubordination because she left early from a mandatory end-of-shift meeting.  Steward Kelly filed grievance 429-03 protesting the discipline.  There was no dispute that plaintiff had left the meeting early without permission.  Local 624's investigation did not support the contention that plaintiff had been singled out and that others either had not attended the meeting or had left early.  DeMatteo concluded the discipline issued was for proper cause and could not be successfully challenged in arbitration.

The second grievance arose from plaintiff's five-day suspension on November 12, 2003, for producing bad parts.  According to DeMatteo, Local 624 initially challenged the discipline on the ground that management had not preserved the parts and thus could not demonstrate that they were bad.  Management then changed the ground for the discipline to insubordination, alleging plaintiff had been instructed to produce different parts, not the ones she actually produced.  Local 624 filed grievance 431-03 protesting the discipline; however, on investigation it concluded management's allegation was true, and there was no valid ground for challenging the discipline.

Third, NVG disciplined plaintiff on February 9, 2004 for reporting late to her job.  Local 624 filed grievance 39-04 protesting the discipline.  DeMatteo states Local 624's investigation

-18-

revealed no support for plaintiff's assertion that she was on time, and he concluded the discipline issued was for proper cause and could not be successfully challenged in arbitration.  He adds: "I am advised that [in her deposition in this lawsuit, plaintiff] claims to have told me that various coworkers had witnessed her timeliness but were afraid to come forward, but this is not true.  We heard nothing about the supposed reluctant witnesses until this lawsuit was filed."  DeMatteo says he subsequently spoke with one of the alleged witnesses, Sungjin Chang, who denied any knowledge of the incident.

On this motion, Local 624 submits affidavits from Chang and other employees whom plaintiff identified as having worked near her.  These employees are apparently the ones plaintiff referenced in her deposition as having seen her arrive on time on February 9, 2004, and having declined to vouch for her, due to fear of retaliation.  Chang affirms he reviewed plaintiff's deposition testimony and states:

> In sum, Ms. Burke alleges: that she had arrived timely at the start of the second shift and was working at her job at 3:01 p.m.; that the department supervisor, Jesse Hall, accused her of being late; that she was disciplined; and that she asked me if I would confirm her timeliness to the union steward, but that I declined due to fear of retaliation by Mr. Hall.
>
> This testimony is false. No such event involving me ever took place.  If I were a witness to Ms. Burke (or any other employee) being unfairly disciplined for being late, I would certainly vouch for her. This event did not happen in my presence or involve me in any way.

Similarly, with respect to the same incident, a coworker, Janice Barnes, submits an affidavit stating: "I have no recollection of this event and do not believe that it occurred.  I am certain that I was never asked and never declined to vouch for Ms. Burke's being on time to her job.  I have never feared retaliation from Mr. Hall as alleged by Ms. Burke."  The record contains affidavits to similar effect from coworkers Staci Whitlock and Rhonda Lynch.

-19-

The fourth incident, occurring on February 1, 2005, resulted in plaintiff's suspension for 30 days for producing bad parts. Local 624 filed grievance 14-05 protesting the discipline. The employer claimed plaintiff left her machine running unattended for two and a half hours after she had been instructed to leave it and produce parts on a different machine. Local 624 obtained a statement from an employee, Aaron Bush, who had found the machine still running at 9:30 p.m. DeMatteo concluded the discipline issued was for proper cause and could not be successfully challenged in arbitration.

And finally, plaintiff was discharged on May 13, 2005. In this respect, DeMatteo's affidavit states as follows:

> Ms. Burke was discharged on May 13, 2005. Ms. Burke's supervisor, Brian Gigon, issued a DMR detailing Ms. Burke's continued poor production, refusal to accept additional training, and returning late from breaks. The final straw was on May 12, 2005, when she returned 15 minutes late from her lunch break. Grievance no. 43-05 protesting the discharge was filed[.] During our investigation, the company provided production records documenting the woefully inadequate production cited in the DMR. We obtained a statement from an experienced Setup employee, David Cerio, indicating his belief that Ms. Burke was feigning her repeated need to have the Setup person reset her machine. We had no evidence to contest the employer's accusations except for Ms. Burke's denials, which I did not believe were credible. In my view, the discipline issued was for proper cause and could not be successfully challenged in arbitration.

(Citations to record omitted.) The union defendants submit an affidavit from David Cerio to the same effect as his statement cited in DeMatteo's affidavit.

In her deposition, plaintiff alleged that on May 12, 2005, the day before her discharge, she was unfairly charged with returning late from break, whereas two other female employees who left the break room at the same time – Staci Whitlock and Rhonda Lynch – were not disciplined. In her affidavit, Whitlock states that she has no recollection of the incident and further that on the

day in question, May 12, she was out of work on sick leave.  She attaches her attendance record.

Rhonda Lynch submits an affidavit stating she has no recollection or knowledge of the incident.

In further support of their motion, the union defendants rely on affidavits from plaintiff's coworkers Janice Barnes, Rick Franklin, Lori Napier, David Cerio, Holly Gaines, and Shawn Beaudette, confirming the employers' and union officials' contentions.  The coworkers state on personal knowledge that plaintiff did not conform to the rules and expectations set by management; that she often arrived on her job past the 3 p.m. start time; that frequently she would arrive at the plant shortly before 3 p.m., but then change into her work clothes and report to her machine late; that she took overly long breaks; that often she would arrive late to end-of-shift meetings held by the supervisor; that her production numbers were frequently low; that she slept on the job on a number of occasions; that she produced bad parts on a number of occasions; and that these were ongoing problems with different supervisors.

Accordingly, the Court finds that Local 624 has demonstrated that it handled plaintiff's pending grievances fairly; that it investigated each grievance; and that based on its investigations, it reasonably and in good faith determined that the employer did not violate the collective bargaining agreement and that the grievances lacked merit.  Thus, Local 624 has demonstrated that in exercising its discretion in evaluating the merits of plaintiff's grievances and deciding to withdraw them rather than proceed to arbitration, it acted honestly and in good faith, without hostility, discrimination, or arbitrary conduct.

Plaintiff's amended complaint, deposition testimony, notarized Memorandum of Law, affidavit, and written grievances contain statements contradicting certain aspects of the union defendants' submissions.  However, the issue before the Court is not whether the information

-21-

relied on by Local 624 in deciding to withdraw the five pending grievances is accurate in all respects; rather, the issue is whether there is record evidence creating a question of fact on whether Local 624 fulfilled its duty of representing plaintiff honestly and in good faith, without hostility, discrimination, or arbitrary conduct.  Viewing the evidence in the light most favorable to plaintiff, and drawing all inferences in her favor, the Court concludes on this record that no reasonable finder of fact could find that Local 624 failed to fulfill this duty in any respect.  Local 624 is entitled to summary judgment dismissing plaintiff's claims of breach of duty of fair representation.

Plaintiff's claims against the union defendants are dismissed in their entirety.  Her cross-motion for summary judgment against the union defendants is denied.

## CONCLUSION

It is therefore

ORDERED that the motion for summary judgment (Dkt. No. 61) by New Venture Gear, Inc., is granted with respect to plaintiff's claims under sections 1981 and 1983, and otherwise denied; and it is further

ORDERED that the motion for summary judgment (Dkt. No. 63) by defendants Scott Stanton, President of United Automobile, Aerospace and Agricultural Implement Workers of America Local 624 ("Local 624"), and Stephen Yokich, President of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, is granted; and it is further

ORDERED that plaintiff's cross motion for summary judgment (Dkt. No. 65) is denied; and it is further

-22-

ORDERED that the action shall proceed to trial solely on plaintiff's claims against NVG under Title VII alleging that she was subjected to sexual harassment and retaliation as set forth herein.

IT IS SO ORDERED.

March 28, 2008
Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge

-23-